Filed 5/11/23  P. v. Bradshaw CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>LAMONT DUSTIN BRADSHAW,<br><br>    Defendant and Appellant. | F084078<br><br>(Super. Ct. No. BF126716A)<br><br>**OPINION** |

### THE COURT*

APPEAL from an order of the Superior Court of Kern County.  Chad A Louie, Judge.

Athena Shudde, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, and Paul E. O'Connor, Deputy Attorney General, for Plaintiff and Respondent.

-ooOoo-

---

\*        Before Hill, P. J., Franson, J. and Peña, J.

In 2009, appellant Lamont Dustin Bradshaw was convicted of various crimes, including conspiracy to commit murder, after he was involved with two other gang members in the drive-by shooting of a rival gang member. Following the superior court's recent denial of appellant's resentencing petition under Penal Code section 1170.95[1] (now renumbered as § 1172.6),[2] appellant's appointed counsel asked this court to review the record to determine whether there are any arguable issues on appeal. (*People v. Wende* (1979) 25 Cal.3d 436.) Appellant was advised of his right to file a supplemental brief within 30 days of the date of filing of the opening brief. Appellant responded, contending (1) his conviction for conspiracy to commit murder should be eligible under section 1172.6, (2) the trial court's instructional error rendered that conviction eligible under section 1172.6, and (3) we should vacate that conviction because the instructional error resulted in a miscarriage of justice. We affirm the superior court's order denying the section 1172.6 petition.

## PROCEDURAL SUMMARY

On August 18, 2009, a jury found appellant guilty of conspiracy to commit murder (§§ 182, subd. (a)(1), 187, subd. (a); count 1), conspiracy to discharge a firearm at an occupied vehicle (§§ 182, subd. (a)(1), 246; count 3), carrying a loaded firearm by an active participant in a criminal street gang (§ 12031, subd. (a)(2)(C); count 4), active participation in a criminal street gang (§ 186.22, subd. (a); count 5), and possession of a firearm in violation of probation (§ 12021, subd. (d); count 6). The jury acquitted appellant of attempted murder (count 7) and discharging a firearm at an occupied vehicle (count 8). The jury found true various special allegations, including a firearm allegation (§ 12022.53, subds. (d) & (e)(1)), but found not true the allegation that defendant

---

[1]    All statutory references are to the Penal Code.

[2]    Effective June 30, 2022, section 1170.95 was renumbered as section 1172.6 with no substantive change. (Stats. 2022, ch. 58, § 10.) We will refer to this statute as section 1172.6 henceforth.

intentionally inflicted great bodily injury or death as a result of discharging a firearm from a vehicle (§ 12022.55).[3]

On May 21, 2010, the trial court sentenced appellant to 65 years to life in prison as follows:  25 years to life on the conspiracy to commit murder count, plus a 25-year-to-life firearm enhancement, and 15 consecutive years on count 3.  The upper terms on the remaining counts were stayed pursuant to section 654.

Appellant appealed, and on August 11, 2011, we reversed the conviction on count 3 because it arose from the same conspiracy as the conspiracy to commit murder, and we remanded for resentencing.  (*People v. Bradshaw* (Aug. 11, 2011; F060386) [nonpub. opn.].)[4]

On December 14, 2011, the trial court on remand again imposed 25 years to life on the conspiracy to commit murder count, plus the 25-year firearm enhancement.  And the court again imposed the upper terms on the remaining counts and stayed them pursuant to section 654.

About 10 years later, on February 16, 2022, appellant filed a petition for resentencing under section 1172.6 in the superior court.

On February 24, 2022, the superior court denied the petition, finding appellant was not entitled to relief because he was not convicted of an eligible crime.

On March 21, 2022, appellant filed a notice of appeal.

---

[3]     On the prosecution's motion, the trial court dismissed for insufficient evidence the allegation that appellant had suffered a prior "strike" conviction within the meaning of the "Three Strikes" law (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)).

[4]     On our own motion, and with the parties' consent, we take judicial notice of the opinion and record in *People v. Bradshaw*, F060386.

## FACTS

The following facts are from our 2011 opinion on direct appeal:

"On August 2, 2008, sometime after 2:00 a.m., Bradley Wafford, a member of the Eastside Crips, a criminal street gang, was sitting with his friend D'Ondria Jones in Wafford's Trailblazer. The vehicle was parked across the street from Jones's house, where, that night, there had been a party of between 22 and 30 people. Wafford sat in the driver's seat and Jones sat in the front passenger seat.

"Before Jones crossed the street to get into Wafford's vehicle, she saw a silver Chrysler drive onto Ilene Court where her house was located. The car stopped to let her cross the street and then continued to the end of the cul-de-sac. After Jones got inside Wafford's vehicle, the Chrysler returned and pulled up next to them. Wafford recalled that a person in the Chrysler asked, "Is there a party right here?" When Wafford answered no, someone in the Chrysler fired multiple shots into his vehicle. The car then drove away.

"The arrival of the Chrysler and the shooting were also witnessed by Damiris Woods. Woods, like Wafford, was a member of the Eastside Crips. When the incident occurred, Woods was getting ready to leave the party in his car, which was parked in Jones's driveway, across the street from Wafford's vehicle.

"In the investigation of the shooting, police recovered seven spent .40-caliber shell casings. Forensic testing established that these casings came from a Glock .40-caliber semiautomatic pistol, which was recovered from the backyard of appellant's aunt's house a few hours after the shooting. Police also found three bullets lodged in various locations inside Wafford's vehicle.

"Jones was uninjured in the shooting, but Wafford was struck in the chest and buttocks. He spent three days in the hospital. Doctors could not remove the bullet in his chest because it was too close to his heart; i.e., two inches.

"At 2:35 a.m., emergency dispatch received the first call about the shooting. Around 3:00 a.m., Bakersfield Police Officer Jess Beagley stopped the silver Chrysler. The car's sole occupant was Deandre Wallace, an associate of the Westside Crips gang, a rival of the Eastside Crips.

4

"Officer Beagley conducted a search of the Chrysler and found a digital camera in the center console. The camera contained a picture of appellant holding a Glock firearm. Based on the time stamp, the picture was estimated to have been taken between nine and 11 minutes prior to the time dispatch received the first call about the shooting.

"Appellant's fingerprints were also found on the Chrysler's right rear fender and on the right front fender.

"Wallace testified that, on the night of the shooting, he attended a house party, where he twice loaned out his Chrysler to people who wanted to go buy alcohol. The second time he loaned out the car, he loaned it to appellant and two others, who were gone for about an hour. When the car was returned to Wallace, appellant was not in it.

"Officer Brent Stratton, who interviewed both appellant and Wallace, testified that he eventually determined that the people who reportedly borrowed Wallace's car were appellant, Billy Sanders ('Little Skeet'), and Benny West ('Little Teflon'), all three of whom were members of the Westside Crips.

"Wallace told Officer Stratton that, after the Chrysler was returned to him, he overheard appellant laughing about doing a shooting.

"After the shooting, police officers traced appellant to his aunt's house around 4:30 a.m. The house was located between six and eight miles from where the Chrysler was stopped, and between one and a half to two miles from where the shooting took place.

"Prior to making contact with appellant, Officer Eric Lantz heard appellant talking on a cell phone behind his aunt's house, near the fence separating her property from the neighbor's property. Officer Lantz then observed appellant walk to the back door of his aunt's house. When Officer Lantz went around and knocked on the front door to the house, appellant opened it. Appellant appeared to be nervous. He was breathing heavily and repeatedly asked, 'what did I do, sir?'

"After detaining appellant, Officer Lantz instructed other officers to conduct a search of the residence, starting with the backyard. Officer Lantz asked appellant if he had a firearm or had discarded a firearm, explaining that he was concerned a child might find it and get injured. Appellant responded that the only gun he had was the one in the picture on the digital camera found in Wallace's Chrysler, and that the gun was currently at his friend's house.

5

"Officer Stratton also interviewed appellant and questioned him about the gun in the picture. Appellant initially claimed that it was only an Airsoft gun and that it belonged to Wallace. But when Officer Stratton told appellant that Wallace denied owning an Airsoft gun, appellant admitted it was a real gun and claimed that it belonged to somebody known as Little Skeet (i.e., Sanders) or Little Teflon (i.e., West).

"While appellant was being interviewed, officers found the Glock pistol involved in the shooting. The gun was lying about three feet from the fence in his aunt's backyard.

"Appellant initially claimed that he had been at his aunt's house babysitting all night. Appellant told Officer Stratton that he arrived at her house around 8:00 p.m., and that he had been out with Wallace before that but did not see Wallace again that night. Appellant also claimed the picture of him with the gun was taken around 8:00 p.m.

"After being informed that the Glock pistol had been found in his aunt's backyard, appellant changed his story and told Officer Stratton that the picture of him holding the gun was taken around 2:30 a.m., when Sanders, West, Wallace, and Sanders's girlfriend, Josonia Sterling[,] stopped by his aunt's house. Shortly after they left his house, they called appellant and said they needed help hiding the gun. Appellant told them he could not possess it and he did not want any part of it.

"In a later interview with Officer Stratton, appellant admitted that he was not at his aunt's house the entire night. According to appellant, he left his aunt's house around 1:30 a.m. and went to a party at a nearby motel. He was only there for a short time before he asked for a ride home. Appellant said he came home in Wallace's car, along with Sanders, West, and Sterling. After they left appellant at his aunt's house, he got a call from Sanders asking him to hide the gun.

"Considering a hypothetical based on the facts of the case, the prosecution's gang expert opined that the shooting was committed for the benefit of appellant's gang.

"***The Defense***

"Appellant's cousin, Vatina Walker, testified that appellant arrived at his aunt's house sometime between 10:00 p.m. and midnight. She saw Wallace, who was driving his Chrysler, drop off appellant. To Walker's knowledge, appellant did not leave the house that night and come back.

6

Once she saw him briefly step outside and then come back inside the house after receiving a telephone call.

"Appellant's aunt, Killee Johnson, testified that appellant regularly came to her house on the weekend to help Walker babysit Johnson's and Walker's children, and that had been the plan that night. Around 11:00 p.m., when Johnson left to go to a nightclub, appellant had not yet arrived." (*People v. Bradshaw* (Aug. 11, 2011, F060386) [nonpub. opn.].)

## DISCUSSION

**I.      Section 1172.6 Petition**

Appellant contends the superior court erred in denying his resentencing petition, which was based on his conviction for conspiracy to commit murder, filed pursuant to section 1172.6 and Senate Bill No. 1437 (Senate Bill 1437) (2017–2018 Reg. Sess.) (Stats. 2018, ch. 1015). He asserts that Senate Bill 1437 "should allow individuals convicted of conspiracy to commit murder the same relief as those crimes which may have been specified by legislation …." This is not the state of the law.

Senate Bill 1437, effective January 1, 2019, substantially modified the law governing accomplice liability for murder, significantly narrowing the felony-murder exception to the malice requirement for murder (§§ 188, subd. (a)(3), 189, subd. (e); see *People v. Strong* (2022) 13 Cal.5th 698, 707–708 (*Strong*); *People v. Lewis* (2021) 11 Cal.5th 952, 957 (*Lewis*)), and eliminating the natural and probable consequences doctrine as a basis for finding a defendant guilty of murder (*People v. Gentile* (2020) 10 Cal.5th 830, 842–843 (*Gentile*)). Senate Bill 1437 was enacted to "amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).)

As amended by Senate Bill 1437, section 188, subdivision (a)(3) prohibits imputing malice based solely on an individual's participation in a crime and requires proof of malice to convict a principal of murder, except under the revised felony-murder

7

rule in section 189, subdivision (e).  The latter provision requires the prosecution to prove specific facts relating to the defendant's individual culpability:  The defendant was the actual killer (§ 189, subd. (e)(1)); the defendant, though not the actual killer, with the intent to kill, assisted in the commission of the murder (§ 189, subd. (e)(2)); or the defendant was a major participant in a felony listed in section 189, subdivision (a), and acted with reckless indifference to human life, " 'as described in subdivision (d) of … Section 190.2,' " the felony-murder special-circumstance provision.  (*Strong*, *supra*, 13 Cal.5th at p. 708; see *Gentile*, *supra*, 10 Cal.5th at pp. 842–843.)

Senate Bill 1437 also added section 1172.6, which authorized an individual convicted of felony murder or murder based on the natural and probable consequences doctrine to petition the superior court to vacate the conviction and be resentenced on any remaining counts if he or she could not now be convicted of murder because of the changes Senate Bill 1437 made to the definitions of the crime.  (See *Strong*, *supra*, 13 Cal.5th at p. 708; *Lewis*, *supra*, 11 Cal.5th at p. 957; *Gentile*, *supra*, 10 Cal.5th at p. 843.)

Then, in 2021, Senate Bill No. 775 (2021–2022 Reg. Sess.) extended the provisions of section 1172.6 to include convictions for attempted murder and manslaughter—but *not* conspiracy to commit murder—by modifying the law to "expand the authorization to allow a person who was convicted of murder under any theory under which malice is imputed to a person based solely on that person's participation in a crime … to apply to have their sentence vacated and be resentenced" (Legis. Counsel's Dig., Sen. Bill No. 775 (2021–2022 Reg. Sess.)) and to clarify "that persons who were convicted of attempted murder or manslaughter under a theory of felony murder and the natural probable consequences doctrine are permitted the same relief as those persons convicted of murder under the same theories."  (Stats. 2021, ch. 551, § 1, subd. (a).)

Accordingly, section 1172.6 now expressly includes attempted murder and manslaughter convictions as eligible convictions, but it does not expressly include

conspiracy to commit murder convictions. Nor does the legislative history suggest that it implicitly includes them. (*People v. Whitson* (2022) 79 Cal.App.5th 22, 34–36 [conspiracy to commit murder conviction not within the rubric of § 1172.6].) Thus, as a matter of law, a conviction for conspiracy to commit murder is not eligible under section 1172.6. (*Ibid.*)

## II.    Instructional Error

We briefly address appellant's argument that an instructional error at his trial rendered his conspiracy to commit murder conviction eligible under section 1172.6 because it demonstrates the jurors did not necessarily find he had the intent to kill. Specifically, appellant contends the version of CALJIC No. 8.69 given by the trial court in his case, describing the elements of conspiracy to commit murder, erroneously omitted the element of intent to kill. This alleged error, however, could not render his conviction eligible under section 1172.6 for the simple reason that, as we have said, section 1172.6 does not apply to convictions for conspiracy to commit murder. The alleged instructional error would not alter this fact.[5]

Defendant also contends the alleged instructional error requires that we vacate his conspiracy to commit murder conviction because the instructional error resulted in a miscarriage of justice. We cannot address this issue here because trial issues are not cognizable on this appeal from a post-judgment order denying a section 1172.6

---

[5]    Defendant may be misled by another situation, not applicable here, where this alleged misinstruction on conspiracy to commit murder could be relevant to sentencing under section 1172.6. That occurs when a defendant was *also* convicted of an eligible crime, such as murder. In that situation, the *murder* conviction could be eligible for resentencing. (See *People v. Whitson*, *supra*, 79 Cal.App.5th at pp. 31–36 [because of an erroneous instruction on conspiracy to commit murder, the court reversed the denial of a resentencing petition as to the murder and attempted murder convictions, but *not* as to the conspiracy to commit murder conviction].) Here, appellant was not convicted of murder or any other eligible crime, and thus the alleged misinstruction would not affect his eligibility for resentencing under section 1172.6.

9

resentencing petition. The judgment in defendant's case has long been final and the time for direct appeal of trial issues has passed.[6]

## III. *Franklin*[7] **Proceeding**

We note that because appellant committed the crimes in this case when he was 17 years old, he is entitled to a *Franklin* proceeding to present and preserve evidence of his youth-related factors that will be relevant to any eventual parole hearing, whether it be a youth offender parole hearing or a regular parole hearing.

The legal landscape regarding juveniles convicted of crimes changed significantly in the years after appellant was convicted. One change resulted in mandatory parole hearings for certain youth offenders who had been sentenced to mandatory and lengthy prison terms. Responding to precedent from the United States Supreme Court and the California Supreme Court declaring that mandated sentences of life without the possibility of parole and their equivalents imposed on juveniles are unconstitutional, the Legislature, in 2014, passed Senate Bill No. 260 (2013–2014 Reg. Sess.) (Stats. 2013, ch. 312, §§ 1–5), which added sections 3051 and 4801, subdivision (c) to the Penal Code. (*Franklin*, *supra*, 63 Cal.4th at p. 276.) These provisions ensure that youth offenders receive a "youth offender parole hearing" (YOPH) and require the Board of Parole Hearings "not just to consider but to 'give great weight to the diminished culpability of juveniles as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity of the prisoner in accordance with relevant case law.'

---

**6** The issue of whether an instructional error occurred at trial, and how such an error might affect defendant's conviction for conspiracy to commit murder itself, must now be raised by way of a petition for writ of habeas corpus. On our own motion, and with the parties' consent, we take judicial notice that appellant filed a petition for writ of habeas corpus in this court on March 17, 2020, but we denied the petition without prejudice on May 14, 2020, because appellant did not include the required documentation to support both his petition and his exhaustion of the legal remedy of filing first in the Kern County Superior Court. (*In re Bradshaw* (F080948).)

**7** *People v. Franklin* (2016) 63 Cal.4th 261 (*Franklin*).

(§ 4801, subd. (c).)" (*Franklin*, *supra*, 63 Cal.4th at p. 277.)  In other words, these provisions " 'create a process by which growth and maturity of youthful offenders can be assessed and a meaningful opportunity for release established.' " (*Ibid*.)

Under section 3051, a person incarcerated for a "controlling offense" committed when the person was 25 years of age or younger is eligible for release on parole at a YOPH.  (§ 3051, subds. (a)(1), (b).)  Depending on the offense, the parole hearing must be held by the prisoner's 15th, 20th, or 25th year of incarceration.  (§ 3051, subd. (b).)  The right to a YOPH applies retrospectively to all eligible youth offenders regardless of their date of conviction.  (*Franklin*, *supra*, 63 Cal.4th at p. 278.)

Our Supreme Court decided that, as an integral part of this process, youth offenders must have the opportunity "to make an accurate record of [their] characteristics and circumstances at the time of the offense so that the Board, years later, may properly discharge its obligation to 'give great weight to' youth-related factors (§ 4801, subd. (c)) in determining whether the offender is 'fit to rejoin society ….' " (*Franklin*, *supra*, 63 Cal.4th at p. 284.)  Even youth offenders whose judgments are otherwise final, like appellant in this case, are entitled to this evidence-preserving process, called a *Franklin* proceeding, because "the possibility that relevant evidence will be lost may increase as years go by." (*In re Cook* (2019) 7 Cal.5th 439, 450–451 (*Cook*).)

In *Franklin*, the defendant was 16 years old when he committed murder, and the trial court was statutorily required to sentence him to two consecutive sentences of 25 years to life.  (*Franklin*, *supra*, 63 Cal.4th at p. 268.)  The *Franklin* court concluded it was unclear whether the defendant had sufficient opportunity at sentencing to make a record of his youth-related characteristics.  (*Id*. at p. 284.)  The court remanded the case to the trial court to determine whether the defendant had an opportunity to make this record.  (*Id*. at pp. 286−287.)  From that case, the term "*Franklin* proceeding" has emerged.

11

For defendants whose judgments are final, "the proper avenue is to file a motion in superior court under the original caption and case number, citing the authority of section 1203.01 and [*Cook*]." (*Cook*, *supra*, 7 Cal.5th at p. 458; see *People v. Benzler* (2021) 72 Cal.App.5th 743, 748–749.)

Lastly, we note that a *Franklin* proceeding is available even to defendants who are *ineligible* for a YOPH (for example, because they were sentenced under the Three Strikes law). As *People v. Delgado* (2022) 78 Cal.App.5th 95, 103 (*Delgado*) has recently held, "there is another legal basis for granting … a *Franklin* proceeding. [T]hat entitlement lies in subdivision (c) of section 4801, which was enacted in conjunction with [section] 3051. [¶] Like section 3051, section 4801, subdivision (c) was enacted in 2014 as part of the Legislature's effort to bring California law into conformity with Supreme Court precedent respecting juvenile sentencing. (*Franklin*, *supra*, 63 Cal.4th at pp. 268, 276.)" (*Delgado*, at p. 103, fn. omitted.)

"Section 3041.5 sets forth the procedures governing parole hearings and applies generally to 'all [such] hearings.' (§ 3041.5, subd. (a).) It is apparent from the Legislature's reference to that statute that it intended the criteria set forth in section 4801, subdivision (c) to apply broadly to all parole hearings, not just YOPHs. [Citations.] Consequently, even though [a defendant] is not entitled to a YOPH, the parole board will still—someday—have to consider his diminished capacity and subsequent maturation in assessing his suitability for parole." (*Delgado*, *supra*, 78 Cal.App.5th at p. 103.)

"Those are the same factors the board must consider in conducting a YOPH under section 3051. Given their importance at [an inmate's] parole hearing, it follows from *Franklin* that he should be given the opportunity to make a record of those factors. Now. [B]ecause section 4801, subdivision (c) requires the parole board to consider youth-related factors during parole hearings for youthful offenders, *Franklin* proceedings

12

should be provided to … all … defendants who are statutorily ineligible for a YOPH under section 3051." (*Delgado*, *supra*, 78 Cal.App.5th at pp. 103–104.)

Accordingly, if appellant has not already been given an opportunity to preserve mitigating evidence of his youth-related factors, he may request a *Franklin* proceeding even if he is found to be ineligible for a YOPH.

## DISPOSITION

The superior court's February 24, 2022 order denying the section 1172.6 petition for resentencing is affirmed.